IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | | |
|---|---|---|---|
| EDDIE TAYLOR | : | NO. 04-177-SLR | |
| **Plaintiff** | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| CIVIGENICS | : | | |
| **Defendant** | : | JURY TRIAL DEMANDED | |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CIVIGENICS

Defendant, Civigenics, Inc., by and through their undersigned counsel, hereby move this Court, pursuant to Rule 56 of the Federal rules of Civil Procedure, for summary judgment. In support of this Motion, Defendant incorporates by reference the attached Memorandum of Law and Points of Authority.

Respectfully submitted,

REGER RIZZO KAVULICH & DARNALL LLP

By: /s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr., Esquire
1001 Jefferson Street, Suite 202
Wilmington, DE 19801
(302)652-3611 (Phone)
(302)652-3620 (Facsimile)

Carla P. Maresca, Esquire
DEASEY MAHONEY & BENDER, LTD.
Suite 1300
1800 John F. Kennedy Boulevard
Philadelphia, PA 19103-2978
(215) 587-9400, ext. 135 (Phone)
(215) 587-9456 (Facsimile)

Attorneys for Defendant, Civigenics

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EDDIE TAYLOR | : | NO. 04-177-SLR |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CIVIGENICS | : | |
| Defendant | : | JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW AND POINTS OF AUTHORITIES IN SUPPORT OF THE <u>MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CIVIGENICS</u>**

Civigenics, Inc. (hereinafter "Defendant") by and through its undersigned counsel, hereby submit this Memorandum of Law and Points of Authorities pursuant to Local Rule 7.1.2(b) in support of its Motion for Summary Judgment.

**I.   INTRODUCTION**

This is a *pro se* inmate case where an inmate, Eddie Taylor (hereafter "Plaintiff"), brings constitutional claims against Defendant based on the treatment he was subjected to while enrolled in The Key North Program during his incarceration at the Howard R. Young Correctional Institution ("Gardner Hill"). Specifically, Plaintiff alleges that inmates were placed in positions of authority over other inmates in violation of the Eighth and Fourteenth Amendments.

**II.   STATEMENT OF FACTS**

    **A.   The Key North Program**

The Key North Program is the first level of the State of Delaware Department of Corrections's substance abuse treatment regimen. (<u>See</u> Substance Abuse Treatment, from Delaware Department of Corrections website attached hereto as Exhibit "A"). The Key Program was established in 1988. In 1990, the Delaware Department of Correction assumed

funding of the program. (<u>See</u> <u>id.</u>). The Key Program is a prison-based therapeutic community with a primary goal of changing negative patterns of behavior, thinking and feelings that predispose an individual to drug abuse. (<u>See</u> <u>id.</u>).  A therapeutic community is one where responsibility, honesty, accountability and participation is promoted. (<u>See</u> Key North Correctional Recovery Program Resident Handbook, attached hereto as Exhibit "B" at p. 3).

The Key North Program ("Program") is located within the Howard R. Young Correctional Institution (Gander Hill). (<u>See</u>  <u>Ex.</u> A).  Although located within the prison, the Program is housed in a separate wing of the prison. (<u>See</u> <u>id.</u>). Inmates enrolled in the Program reside in a dormitory type setting.  (<u>See</u> Deposition of Edward Taylor, dated November 21, 2005, attached hereto as Exhibit "C" at p. 16 ).  Key inmates have greater freedom than non-Key inmates. (<u>See</u> <u>id.</u>). However, the Department of Corrections rules and regulations are enforced by program staff and are in effect at all times. (<u>See</u> <u>Ex.</u> B at p. 16).

Prior to July 1, 2003, the Key program was administered by Spectrum Behavioral Services.  (<u>See</u> Plaintiff's Complaint, Statement of Facts).  On July 1, 2003, Civigenics, Inc. began administrating the program.  (<u>See</u> <u>id.</u>).  Although the purpose and goal of the Program remained unchanged, the structure and philosophy utilized to achieve  these goals was changed.

Typically, inmates become involved in the Program during the last twelve (12) to eighteen (18) months of their incarceration. (<u>See</u> Ex. A).   Upon enrollment into the Program, inmates (now referred to as Residents) are assigned an individual counselor and peer mentor. (<u>See</u> Ex. at B at p. 5; Ex. C at p. 18 ).

The Key program is divided into three phases.  In Phase I, a Resident  participates in the following three groups: (1) orientation group; (2) core skill group; and (3) principals of

recovery. (See Ex. B at p. 14). In addition, Phase I Residents also participate in individual counseling sessions, morning and evening meetings, committee meetings, self-discovery group, twelve step fellowship meetings, D.E.A.L. and peer awareness groups. (See id.) To advance to the next phase the residents are required to take a written test. (See id). In Phase II, a resident participates in the following groups: (1) criminal addictive thinking; (2) learn to work skills; and (3) introduction to 12 steps fellowship. (See id.). Residents also continue to participate in individual counseling sessions, morning and evening meetings, committee meetings, self-discovery group, twelve step fellowship meetings, D.E.A.L. and peer awareness groups. (See id. at p.15).

In Phase III, residents participate in the following groups: (1) correctional recovery training; and (2) release preparation. (See id.). Phase III residents also participate in individual counseling, morning and evening meetings, committee meetings, D.E.A.L. group twelve step fellowhip meeting, and mentor phase I & II residents. (See id.).

Residents met with their individual counselor once a week. (See id. at pp. 14-5). However, counselors and program staff are available to residents at all times during operating hours, which are from 8:00 a.m. to 9:00 p.m. (See Affidavit of Jay Sylvester attached hereto as Exhibit "D" at ¶9; see also Affidavit of Frank Conston attached hereto as Exhibit "E" at ¶ 10).

In order to promote leadership and job skills, Residents are assigned to various positions within the Program. The jobs are assigned by the Program staff members and counselors. (See Ex. D at ¶ 8). Residents are not involved in the job assignment process. (See id.). None of the Resident positions within the Program enables a Resident to exercise authority over another Resident. (See id. at ¶5; Ex. E at ¶6 ). Jobs available to Residents

include janitorial tasks, maintaining attendance logs, and setting up for functions and leading meetings, with a Program advisor present. (See id. at ¶10). More senior Residents are assigned to newer Residents as orientators. (See Ex. C at p. 51).

At no time during Civigenics administration of the Key Program, were Residents permitted to discipline other resident. (See Ex. D at ¶ 4) All residents are required to report infractions of the program's rule to staff members who would then perform investigation. (See id. at ¶ 7).

It is not the philosophy and/or policy of Civigenics to utilize humiliation and/or degradation tactics on residents. (See id at ¶ 3). All Residents are required to treat one another with respect and dignity. Indeed, peer support is the core concept of the Program. (See Ex. B at 4).

**B.    Plaintiff's Enrollment in the Key North Program.**

Plaintiff has been in and out of prison for the majority of his adult life. Plaintiff was first incarcerated in 1990, at the age of fifteen, on arson and drug related charges. (See Ex. C at p. 5). In 1993 or 1994, Plaintiff was incarcerated for drug trafficking. (See id.). In 1995, he was again incarcerated on theft charges. (See id. at p. 6). In 1996, Plaintiff was incarcerated for second and third burglary charges. (See id. at p. 7). Plaintiff was again incarcerated in 1998 for violation of parole for dirty urine. (See id. at p. 8). In 1998, Plaintiff was incarcerated for violation of parole. (See id.). In 2000, Plaintiff was incarcerated on burglary third charges. (See id. at p. 9).

On April 25, 2002, Plaintiff was sentenced to three (3) years for burglary third charges. (See Offender Status Sheet attached hereto as Exhibit "F"). As part of his sentence, Plaintiff was required to enroll in the Key Program. (See id.).

Plaintiff was enrolled in the Key North Program from December 19, 2002 through March 27, 2004. (See Discharge Summary attached hereto as Exhibit "G"). While in the program, Plaintiff held the following job positions: overseer; chief expediter; "coorder" expediter; D.H. service crew; senior coordinator; and level four program trainer. (See Senior Resident Application attached hereto as Exhibit "H"). Plaintiff also applied to be a senior resident. (See id.).

Plaintiff successfully completed the program on March 27, 2004; however, at the time of his discharge it was noted that he continued to have issues with anger management. (See Ex. G). Following his release from the Program, Plaintiff served an additional nine months. (See Ex. C at p. 60). Plaintiff never sought medical treatment while in the Program. (See id at p. 57). Further, Plaintiff never sought medical treatment following his release from the Program for any injuries allegedly sustained during the Program. (See id. at 60-1).

While in the Program, Plaintiff never saw another inmate review his file. (See id. at pp. 36-7). Furthermore, Plaintiff did not see any names on the folders that he witnessed other inmates working on. (See id.). Plaintiff was never placed in the "hole" during his time in the Program. (See id. at 42). Jobs were assigned by counselors. (See id. at p.31). The penalties for misbehaving were issued by counselors. (See id. at p.40).

III.     ARGUMENT

    A.     **Standard for Summary Judgment**

Rule 56 (c) of the Federal Rules of Civil Procedure is designed to secure a just, speedy and inexpensive determination. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Pursuant to Rule 56 (c), a court should enter summary judgment when the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." fed. R. Civ. P. 56 (c ); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-2 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could find for the non-moving party.  See id. at 251.  The non-moving party cannot escape summary judgment by introducing "a mere scintilla of evidence" in his favor or by relying on "conclusory allegations, improbable inferences, and unsupported speculation." Sarko v. Penn-Del Directory Co., 968 F. Supp. 1026, 1031 (E.D. Pa. 1997)citation omitted); J.Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996).

> B.  Plaintiffs' Claims Against Defendants Are Barred By The Eleventh Amendment to the United States Constitution and, Therefore, This Court Lacks Subject Matter Jurisdiction To Hear Plaintiffs' Claims

The Eleventh Amendment to the United States Constitution provides that the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State.  The Eleventh Amendment to the United States Constitution stands for the constitutional principle that State sovereign immunity limits the Federal Court's jurisdiction under Article III.  See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S. Ct. 1114 (1996).

Furthermore, the Eleventh Amendment to the United States Constitution limits Federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed.  See Neely v. Samis, 183 F. Supp. 2d 672, 678 (D. Del. 2002) *quoting* Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98-100, 104 S. Ct. 900, 79 L.Ed.2d 67 (1984).  Although a State's sovereign immunity may be waived by United States Congress, this will only be done by clear indication of

Congress' intent to waive the State's immunity.

42 U.S.C. § 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.   A state or state agency is not a "person" for purposes of Section 1983 claims. Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989). Civigenics is a correctional services firm who through contracts with the State, provides correctional treatment programs, in-prison substance abuse treatment programs and drug testing, as well as other services.  Pursuant to Civigenics' contract with the State, it acted under "under color of State law".

In the resent case of John Hamilton, et. al. v. Civigenics[1], et. al., 2005 U.S. Dist. LEXIS 2625 (Del. 2005), the Delaware District Court held that Civigenics and its employees were state actors because they were employed by the state of Delaware to provide treatment to inmates, and therefore acted under the color of the law for purposes of Section 1983.  Id. at *18.  The Court therefore dismissed plaintiffs' complaint against Civigenics on the basis of governmental immunity.

---

[1] This is the action which Plaintiff refers to in his deposition and to which Gregory Phillips was a party.  Mr. Phillips was the individual who advised  Plaintiff to file a lawsuit and assisted him in the preparation of his complaint. (See Ex. C at p. 48-9).

Therefore, based on the holding of Hamilton, *supra*, the instant matter should be dismissed as the Federal District Court is without subject matters jurisdiction to hear plaintiffs' claims against Defendant.

    **C.    Plaintiff Cannot Sustain A Claim Under Section 1983 Because He Failed to Prove That He Was Subjected To Cruel And Unusual Punishment In Violation Of The Eighth Amendment.**

In order to establish a claim under Section 1983, a plaintiff must prove by a preponderance of the evidence that the conduct committed by one acting under color of state law deprived the plaintiff of "rights, privileges, or immunities guaranteed by the Constitution." Parratt v. Taylor, 451 U.S. 527, 535 (1981). Plaintiff has failed to do so and his Section 1983 claims therefore should be dismissed as a matter of law.

    **1.    Plaintiff Cannot Establish That Civigenics Adopted Policies, Practices Or Customs That Resulted In His Alleged Constitutional Deprivations.**

In order for a plaintiff to prevail on a Section 1983 claim, a plaintiff "must show that the defendant, through conduct sanctioned under the color of state law, deprived him of a federal constitutional or statutory right." Gruenke v. Seip, 225 F. 3d 290, 298 (3d cir. 2000). Liability under Section 1983 cannot be premised on a theory of *respondeat superior*. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3rd Cir. 1988). In Monell v. New York City Dep't of Social Services, the Supreme Court held municipal corporations were "persons" under Section 1983. In order, however, for a municipal corporation to be liable under Section 1983, a plaintiff must prove that the municipal corporation had in place a policy, practice or custom which caused the deprivation of a constitutional right. Monell, 436 U.S. 658, 691-5 (1978). Again, Section 1983 liability cannot be premised on a theory of *respondent superior*. Likewise, should Civigenics be found to be a "person" under Section 1983, it would be

necessary for Plaintiff to establish that Civigenics had in place a policy, practice or custom which caused the deprivation of a constitutional right. See id.

A custom may be established only by evidence that a practice, although not authorized by law, is so permanent and well settled as to virtually constitute law. See Beck v. City of Pittsburgh, 89 F. 3d 966, 971 (3d Cir. 1996). To prove a "custom" a plaintiff must establish "that policy makers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure ....led to plaintiff's injury." Id. at 972.

In the instant matter, Plaintiff has failed to establish that Civigenics had a policy, practice or custom in place permitting inmates to have authority over other inmates. Specifically, Plaintiff has failed to produce any evidence that any policy maker of Civigenics was aware of unconstitutional conduct taking place in the Program. Similarly, Plaintiff has failed to establish that Civigenics has a policy, practice or custom in place permitting inmates to humiliate or intimidate other inmates. To the contrary, the Affidavits of Jay Sylvester and Frank Coston clearly establish that Civigenics' policies and practices do not permit inmates to exercise authority over other inmates or engage in humiliation and/or intimidation tactics.

Because Plaintiff can not establish that Civigenics had a policy, practice or custom which caused the deprivation of a constitutional right, Plaintiff's complaint must be dismissed as a matter of law.

2. **Plaintiff Can Not Prove That His Conditions Of Confinement Amounted To Cruel And Unusual Punishment.**

When determining whether conditions of confinement constitute cruel and unusual punishment, courts consider whether the conditions "involve the wanton and unnecessary infliction of pain [or are] grossly disproportionate to the severity of the crime warranting

imprisonment." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). However, "[t]he Constitution ...does not mandate comfortable prisons...and only those depriving the minimal civilized measure of life's necessities... are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes, 453 U.S. at 347-49). In Seiter, the Supreme Court clarified that, to establish that prison conditions amount to cruel and unusual "punishment" a plaintiff must satisfy a two prong test: (1) an objective component, considering whether the conditions were sufficiently serious to amount to a violation of the Eighth Amendment; and (2) a subjective component, considering whether the prison officials acted with "deliberate indifference" when imposing or failing to remedy such conditions. See Seiter, 501 U.S. at 298, 303.

Clarifying the objective component of the Seiter test, the Third Circuit considers the following objective criteria, originally set forth in Justice Brennan's concurrence in Rhodes:

> Lighting, heating, plumbing, ventilation, living space, noise levels, recreations space...control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping and working...protection from violent, deranged or diseased inmates, fire protection, emergency evacuation...clothing, nutrition, bedding, medical dental and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming...trained and adequate guards and other staff, avoidance of inmates in positions of authority over other inmates...

Peterkin v. Jeffes, 855 F.2d 1021, 1025 n.7 (3d Cir. 1998). District courts are to consider such criteria alone or in combination to determine if they meet the objective prong of the Seiter test. See id.

No Third Circuit court has specifically held that an inmate could not be placed in a supervisory position over another inmate. Although it is generally recognized that inmates are not permitted to have administrative or supervisory authority over other inmates or be placed in positions to administer disciplinary action, inmates are permitted to perform or

hold certain job functions. Such functions include: distribution of correspondence, commissary script or goods; operation of television sets; operation of day room games or activities; monitoring the whereabouts of other inmates; and performing janitorial services. Gates v. Collier, 501 F.2d 1291, 1308 (5th Cir. 1974).

It is well established that verbal abuse or harassment do not rise to the level of a constitutional violation. Johnson v. C/O Coventry, 2006 U.S. Dist. LEXIS 2530, *4 (D.Del. 2006)(use of threatening language and gestures by prison personnel are not cognizable claims under §1983) citing McBride v. Deer, 240 F.3d 1287, 1291 (10th Cir. 2001)(taunts and threats are not an Eighth Amendment violation); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 189 (D. N.J. 1993)(verbal harassment does not violate inmate's constitutional rights); Collins v. Courdy, 603 F.2d 825 (10th Cir. 1979)(defendant laughed at prisoner and threatened to hang him).

Here, Plaintiff makes vague allegations of other inmates directing him to sit or stand on various occasions and on only one occasion an inmate making him rub a chest in a picture. (See Ex. C at p. 25). Further, Plaintiff alleges that more senior residents "ran" the Program and would tell other inmates what to do. Plaintiff also alleges that the inmates made disciplinary decisions. (See id. at 40-1). Plaintiff bases this on his view that because discipline was enforced quickly a supervisor would not have time to conduct an investigation. (See id.). Plaintiff, however, was basing this on mere speculation. (See id). Plaintiff's allegations that inmates assigned other inmates to positions is simply incorrect. Plaintiff acknowledges that a Program Supervisor assigned the positions. (See id. at p.  ).

Plaintiff's allegations, even if true (which Defendants adamantly deny) do not rise to the level of a constitutional violation. Plaintiff acknowledges that the counselors appointed

Residents to job positions and issued all disciplinary sanctions.  As evidenced by the Affidavits of Jay Sylvester and Frank Coston no inmate had any authority over any other inmate.

      **D.**    **Plaintiff's Claims Are Barred By The Prisoner Litigation Reform Act.**

      **1.**    **Plaintiff Has Failed to Exhaust All Administrative Remedies.** [2]

Pursuant to the Prisoner Litigation Reform Act, prisoners must exhaust "such administrative remedies as are available" before bringing actions "with respect to their prison conditions." 42 U.S.C. Section 1997e(d)(2). In an opinion authored by Justice Ginsburg, the United States Supreme Court held that this exhaustion requirement applies to all inmate suits seeking redress for prison circumstances or occurrences, whether the suits involved general circumstances or particular episodes, and whether the suits alleged excessive force, actual physical prison conditions, or some other alleged wrongdoing. Correction Officer Porter, et. al. v. Nussle, 534 U.S. 516 (2002). This exhaustion requirement is mandatory. Id. Moreover, *exhaustion* of administrative remedies means completing all available appeals, even if prison officials do not respond. See Davis v. Warman, et. al., 49 Fed. Appx. 365, 366 (3d Cir. 2002); Brown v. Morgan, F.3d 595, 596 (6th Cir. 2000).

In the instant matter, Plaintiff testified that he completed only one grievance and filed it with Civigenics personnel. Plaintiff acknowledged that this was the only grievance that he filed.  Plaintiff, however, did not file any grievance with the Delaware Department of Corrections prior to initiating this lawsuit.  Inmates enrolled in the Key Program are still required to follow Department of Corrections procedures. (See Ex.D at ¶ 14).

---

[2] Defendant filed a Motion to Dismiss on the basis that Plaintiff failed to exhaust his administrative remedy within the Civigenics system, which was denied by this Honorable Court.  The current argument is based on Plaintiff's failure to exhaust all administrative remedies within the Delaware Department of Corrections.

An inmate may request a grievance form from an officer on duty. The inmate then forwards the grievance to the Grievance Chair. (See id.) The Grievance Chair then reviews the grievance and forwards it to the appropriate party to investigate the complaint. (See id.) In the instant matter, it would be the Director of the Key Program. (See id.) The Director would then investigate the complaint which would include speaking with the inmate. Upon completion of the investigation, the Director would then forward the results of the investigation back to the Grievance Chair notify him or her whether the matter could or could not be resolved. (See id.) The Grievance Chair would then notify the inmate of the investigation. (See id.) The inmate would then have the ability to appeal the decision. (See id.)

Plaintiff failed to file any grievance with the Department of Corrections. Therefore, he failed to exhaust all administrative remedies as required by the PLRA and his claims should be dismissed as a matter of law.

### 2. Plaintiff's Claims For Emotional Injuries Are Barred By The PLRA.

The PLRA provides that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997 (e). Further, the physical injuries can not be *de minimis*. Luong v. Hattt, 979 F. Supp. 481 (N.D. Tex. 1997) (dismissing claim of failure to protect despite five incidents of assault inflicting cuts, scratches, abrasions, lacerations, redness, and bruises; only injuries that require medical treatment or inflict lasting disability or severe pain meet the physical injury requirement).

In the instant matter, Plaintiff seeks monetary damages for mental anguish and physical pain. (See Plaintiff's Complaint at p.4). Plaintiff, however, has failed to produce

any evidence of physical injury.  In his Statement of Facts, Plaintiff refers to having knee pain from time to time.  However, during his deposition, Plaintiff acknowledged that he never sought medical treatment. (See Ex. C at pp. 60-1 ).  Moreover, he made no reference to physical injuries during his testimony. Plaintiff strictly referenced emotional injuries.  Even if Plaintiff sustained knee pain, it would clearly be a *de minimis* injury.

Because Plaintiff seeks damages for purely emotional injuries, Plaintiff 's claim is barred by the PRLA and must be dismissed.

## IV.   CONCLUSION

For all the aforementioned reasons, Defendant, Civigenics, Inc. , respectfully requests that this Honorable Court grant its Motion for Summary Judgment and dismiss this action with prejudice.

Respectfully submitted,

REGER RIZZO KAVULICH & DARNALL LLP

By:      /s/ Louis J. Rizzo, Jr.
         Louis J. Rizzo, Jr., Esquire
         1001 Jefferson Street, Suite 202
         Wilmington, DE 19801
         (302)652-3611 (Phone)
         (302)652-3620 (Facsimile)

Carla P. Maresca, Esquire
DEASEY MAHONEY & BENDER, LTD.
Suite 1300
1800 John F. Kennedy Boulevard
Philadelphia, PA  19103-2978
(215) 587-9400, ext. 135 (Phone)
(215) 587-9456 (Facsimile)

Attorneys for Defendant, Civigenics